FILED
2012 Apr-02  PM 02:24
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

DEBRA JOYCE VARNER,                )

    PLAINTIFF,                )

VS.                )          **2:10-cv-2737-JHH**

VIDEO INDUSTRIAL SERVICES,    )
INC.; and CARYLON
CORPORATION,                )

    DEFENDANTS.                )


## MEMORANDUM OF DECISION AND ORDER

The court has before it two motions for summary judgment, both filed on September 1, 2011. The first motion was filed by Defendant Carylon Corporation (Doc. #21), and the second was filed by Defendant Video Industrial Services, Inc. ("VIS"). (Doc. #23.) Pursuant to the court's September 6, 2011 and October 11, 2011 orders (docs. # 25 & 27), the motions were deemed submitted, without oral argument, on October 25, 2011. After careful review of the briefs and admissible evidence, the court concludes that the motions[1] are due to be granted for the following

---

[1] The court notes that VIS <u>did not</u> move for summary judgment as to Plaintiff's retaliation claim. As explained by the court in its October 25, 2011 order (doc. #41), the Motion (Doc. # 23) does <u>not</u> address the retaliation claim asserted by Plaintiff. Additionally, the court denied Defendant's motion (doc. #40) to clarify to include the retaliation claim. (Doc. #41.) Any argument as to the retaliation claim made by Defendant VIS in its reply brief is, therefore, **SRICKEN** and disregarded by the court.

reasons.

## I. Procedural History

Plaintiff Debra Joyce Varner, an African American, commenced this action on October 12, 2010 by filing a complaint in this court alleging violations of Title VII of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e <u>et. seq</u> and 42 U.S.C. § 1981. Plaintiff contends that Defendants' alleged conduct constitutes race discrimination and retaliation and racial harassment. More specifically, Plaintiff contends that she was subjected to unlawful harassment because of her race, that she was terminated because of her race and that she was retaliated against because of her race. (<u>See</u> Compl. ¶¶ 89-99.) Defendant Carylon's Motion (doc. #21) for Summary Judgment contends that Carylon is not Plaintiff's "employer." Defendant VIS's Motion (doc. #23) for Summary Judgment contends that Plaintiff's claims fail as a matter of law because Plaintiff failed to rebut Defendants' legitimate, nondiscriminatory reasons for Plaintiff's termination (<u>id.</u> ¶ 2) and that she "failed to state a cognizable claim for racial harassment and/or hostile work environment."[2] (<u>Id.</u>)

Carylon, VIS and the Plaintiff have filed briefs and submitted evidence in

---

[2] Again, the court notes that VIS <u>did not</u> move for summary judgment as to Plaintiff's retaliation claim.

support of their respective positions.  Defendant Carylon submitted a brief and evidence[3] (docs. # 22) in support of its motion for summary judgment on September 1, 2011.  Defendant VIS submitted a brief and evidence[4] (doc. # 24) in support of its motion on September 1, 2011. On October 18, 2011, Plaintiff filed briefs (docs. # 28 & 31) and evidence[5] (docs. # 29, 30, 32-37 ) in opposition to Defendants' motions for summary judgment.  On October 25, 2011, Defendants filed briefs and evidence[6] (docs. # 42 &43) in reply to Plaintiff's opposition to the motions for summary

---

[3] Defendant Carylon submitted the following evidence in support of summary judgment: affidavit of Hoard Harris; excerpts of deposition of Howard Harris; excerpts of deposition of Rodney Blackmon; ; affidavit of Rodney Blackmon with exhibits; affidavit of Drew Mahan with exhibits; excerpts of deposition of Drew Mahan; excerpts of deposition of Dawn English; and excerpts of deposition of Debra Varner.

[4] Defendant VIS submitted the following evidence in support of summary judgment: affidavit of Drew Mahan with exhibits; deposition of Drew Mahan with exhibits; excerpts of deposition of Terry Rodney Blackmon with exhibits; excerpts of deposition of Dawn English; affidavit of Dawn English; excerpts of deposition of Howard Harris; excerpts of deposition of Debra Varner with select exhibit; excerpts of deposition of Tristan Hood; excerpts of deposition of David Lockhart; excerpts of deposition of Joshua Renard; affidavit of David Lockhart with exhibit; and affidavit of Rodney Blackmon with exhibits.

[5] Plaintiff submitted the following evidence in opposition: declaration of Debra Varner; deposition of Debra Varner with certain exhibits; deposition of Rodney Blackmon with certain exhibits; deposition of Drew Mahan with certain exhibits; deposition of Dawn English with certain exhibits; deposition of Joshua Renard with certain exhibits; deposition of David Lockhart with certain exhibits; deposition of Michelle Hand; deposition of Tristen Hood; deposition of Howard Harris; deposition of Connie Norton; deposition of Jerida Shareese Lockhart Browning; Defendants' Objections and Answers to Plaintiff's First Set of Consolidated Discovery Requests to Defendant VIS; and Carylon Corporation "Employee Benefits Booklet."

[6] Defendant Carylon filed excerpts of the deposition of Rodney Blackmon.  Defendant VIS filed affidavit of Michael Bevelle; supplemental affidavit of Dawn English with exhibits; affidavit of Kelvin Pruitt; excerpts of deposition of Drew Mahan; and excerpts of deposition of Debra Varner.

judgment.

On October 18, 2011, Plaintiff also filed a Motion (Doc. #38) to Strike portions of the affidavits of Drew Mahan (paragraphs 6, 8, 32, 37) and David Lockhart (paragraphs 8, 10) filed by Defendants in support of summary judgment. Pursuant to the court's October 19, 2011 order (Doc. #39), VIS filed a response (Doc. #44) in opposition to the motion on October 31, 2011. After consideration of the Motion and Response, the Motion is **DENIED**. The court agrees with the arguments made by VIS in its opposition in that none of the statements are hearsay because they are not offered for the truth of the matter asserted. Therefore, the court considered all the evidence of the record in making its summary judgment determination.

## II. Standards for Evaluating a Summary Judgment Motion

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Chapman v. AI Transport, 229 F.3d 1012, 1023 (11th Cir. 2000) The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a

4

genuine issue of material fact.  Celotex Corp., 477 U.S. at 323.  Once the moving party has met his burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and by his own affidavits, or by the depositions, answers to interrogatories, and admissions of file, designate specific facts showing that there is a genuine issue for trial.  Id. at 324.

The substantive law will identify which facts are material and which are irrelevant.  Chapman, 229 F.3d at 1023; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant.  Chapman, 229 F.3d at 1023; Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson, 477 U.S. at 248; Chapman, 229 F.3d at 1023.  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.  Anderson, 477 U.S. at 249.  The  method used by the party moving for summary judgment to discharge its initial burden depends on whether that party bears the burden of proof on the issue at trial.  See Fitzpatrick, 2 F.3d at 1115-17 (citing United States v. Four Parcels of Real Property, 941 F.2d 1428 (11th Cir. 1991)(en banc)).  If the moving party bears the burden of proof at trial, then it can only meet its initial burden on summary judgment by coming forward with positive evidence

demonstrating the absence of a genuine issue of material fact; i.e. facts that would entitle it to a directed verdict if not controverted at trial.  Fitzpatrick, 2 F.3d at 1115. Once the moving party makes such a showing, the burden shifts to the non-moving party to produce significant, probative evidence demonstrating a genuine issue for trial.

If the moving party does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways.  First, the moving party may produce affirmative evidence negating a material fact, thus demonstrating that the non-moving party will be unable to prove its case at trial.  Once the moving party satisfies its burden using this method, the non-moving party must respond with positive evidence sufficient to resist a motion for directed verdict at trial.

The second method by which the moving party who does not bear the burden of proof at trial can satisfy its initial burden on summary judgment is to affirmatively show the absence of evidence in the record to support a judgment for the non-moving party on the issue in question.  This method requires more than a simple statement that the non-moving party cannot meet its burden at trial but does not require evidence negating the non-movant's claim; it simply requires the movant to point out to the district court that there is an absence of evidence to support the non-moving party's case.  Fitzpatrick, 2 F.3d at 1115-16.  If the movant meets its initial burden by

6

using this second method, the non-moving party may either point out to the court record evidence, overlooked or ignored by the movant, sufficient to withstand a directed verdict, or the non-moving party may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency.  However, when responding, the non-movant can no longer rest on mere allegations, but must set forth evidence of specific facts.  Lewis v. Casey, 518 U.S. 343, 358 (1996) (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992)).

## III. Relevant Undisputed Facts[7]

### A.  Carylon Corporation & VIS: Structure and Management

Defendant Carylon Corporation is the nation's largest private maintenance contractor that specializes in providing a full range of environmental maintenance services to private industry, municipalities and utilities, including, but not limited to the following: chemical cleaning, digital television inspection, hydraulic dredging, infiltration control, wet/dry vacuum cleaning, sewer system studies, and service line inspection and cleaning.  (Harris Aff.)  The headquarters for Carylon are in Chicago, Illinois.  (Id.)  Carylon's President and Chief Executive Officer is Howard Harris,

---

[7] Facts are undisputed unless otherwise expressly noted.    If the facts are in dispute, they are stated in the manner most favorable to the plaintiff.  See Fitzpatrick, 20 F.3d at 1115.

who is responsible for overseeing the eighteen subsidiary companies owned by Carylon.  (Id.; Harris Dep. at 47.)

Defendant VIS is a wholly-owned subsidiary of Carylon.  (Blackmon Dep. at 17; Harris Dep. at 14.)  VIS provides environmental services to a variety of public and private sector customers.  (Mahan Aff. ¶ 1.)  Those services include, among other things, video camera services where VIS crews use video cameras to record images of interior pipes and sewer lines and provide an assessment of the footage to the customer.  (Id.)

The headquarters of VIS is in Pratt City, Alabama.  (Mahan Dep. at 14.)  The Pratt City Office has two divisions: (1) the industrial division, which manages projects for the private sector customers; and (2) the municipal division, which manages projects to the public sector customers.  (Id. at 29; Mahan Aff. ¶ 2.)  VIS Vice President Rodney Blackmon directly manages the industrial division and is responsible for the overall management of the Pratt City Office.  (Blackmon Dep. at 11, 18, 35, 40; Mahan Dep. at 17.)  Blackmon, the highest ranking employee at VIS, is responsible for all management decisions at VIS, including hiring, firing and developing strategic plans to develop and promote the business.  (Blackmon Aff. ¶ 6; Blackmon Dep. at 18.)  Blackmon directly reports to Howard Harris, the President and CEO of Carylon.  (Blackmon Dep. at 16; Harris Aff. ¶ 7.)

8

Also in the Pratt City Office are the Municipal Division Manager of VIS, Drew Mahan and the Office Manager, Dawn English.  Mahan manages all aspects of municipal/government contract, including procuring new contracts, managing existing municipal contract, allocating resources and personnel for municipal projects, and overseeing quality control for all municipal contracts.  (Mahan Dep. at 15-18; Mahan Aff. ¶ 3.)  English is responsible for the day-to-day oversight of administrative operations in the office, including maintaining employee records and the accurate processing of customer billing.  (English Dep. at 6, 14-15; Mahan Aff. ¶ 4.)  Both Mahan and English report directly to Blackmon.  (Blackmon Dep. at 15.)

## B.  Varner's Employment at VIS

Varner began her employment with VIS on February 28, 2008 as Video Data Technician.  (Varner Dep. at 83-84, 113.)  The Video Data Technician position entailed processing video data collected by field work crews and transmitting it to the customer in accordance with customer specifications.  (Id. at 84.) Varner reported directly to Mahan and performed her work duties within the confines of the Pratt City office.  (Id. at 11, 83-84, 113.)  Although she occasionally spoke with personnel from Carylon, including Harris and Safety Manager John Kofod, all of her work assignments and other aspects of her employment were controlled by VIS.  (Id. at 11-12, 18.)

9

Varner was the only Video Data Technician throughout 2008.  (Mahan Aff. ¶ 13.)  In January 2009, however, VIS was awarded two large contracts for the city of Baton Rouge, Louisiana and Gwinnett County, Georgia.  (Id.)  VIS anticipated that these contracts, valued at approximately two million dollars, would cause the volume of work to double during the first quarter of 2009, and be consistently higher throughout the entire year.  (Mahan Dep. at 42.)  Therefore, in February 2009, VIS hired a second Video Data Technician, Tristan Hood, a white male, to help in performing the additional work created by the new contracts.  (Id. at 42-43, 81-83; Varner Dep. at 124-26.)  Both Verner and Mahan trained Hood during his initial weeks on the job.  (Varner Dep. at 115; Hood Dep. at 22.)

After Hood's training was complete, Mahan divided the workloads between Varner and Hood.  (Mahan Dep. at 82-83.)  Mahan assigned Varner to the Baton Rouge project and Hood to the Gwinnett County project.  (Id. at 42.)  Mahan testified that both had heavy workloads and were expected to manage the work.  (Id. at 43.)  Varner testified, however, that she was given a larger workload than Hood.  (Varner Dep. at 127-33, 247.)

In addition to his Video Data Technician position, Hood also was responsible

for the information technology (IT) and computer service duties for Pratt City.[8] (Hood at 23-24.)   Those additional IT duties included building, repairing, and maintaining the field laptop computers, which were house on video trucks and used by the work crews.  (Id.)

### C.  The Baton Rouge Project

The City of Baton Rouge was at the beginning stages of soliciting bids from contractors to repair and/or rebuild several portions of its sewer line and hired VIS to make video footage of different sewer line segments and compile annotated data for each line segment noting any damage and/or modification to the line segment. (Mahan Dep. at 48-60, 81-80; Lockhart Dep. at 31-32.)   According to its contract with the City of Baton Rouge, VIS was expected to submit written reports alerting the City to any damage and/or modifications to the line segments.[9]   (Id.)

To accomplish its end of the contract, VIS sent work crews to Baton Rouge to perform work in each geographic zone identified by the City.  (See Mahan Dep. at 65-66, 72.)  The work crews would insert a camera into a manhole and record the entire length of the line segment, while another worker used a computer program to create

---

[8] Hood had knowledge and experience repairing computer hardware and troubleshooting miscellaneous issues with computer software.  (Hood Dep. at 23-24.)

[9] This requirement was specific to the Baton Rouge contract and was not required by the contract with Gwinnett County.  (Mahan Aff. ¶ 19.)

a data file associated with that video footage, noting all relevant information about the line segment such as damages or defective sections of the pipe, root obstructions and the like.  (Mahan Dep. at 10-29; Lockhart Dep. at 131-32.)  After completion of the line segment, both the video file and data file were stored on a computer located in the video truck.[10]  (Id.)  Those files were then downloaded to computer thumb drives and sent to Pratt City, along with other things, including time cards[11] for each segment, documents related to damages or other conditions that prevented the crew from completing the work segment ("UTC forms") and reports alerting the City to any damage and/or modifications to the line segments ("MEF forms").  (Mahan Dep. at 56-58, 80-81.)

When Varner received this information from the work crews she took the following steps:

(1) Reconcile the data from the time cards and the contents of the thumb drives.  This step included (a) reviewing the time cards to determine how many line segments the employee reported to complete; (b) briefly reviewing the contents of the thumb drives and confirm that the footage and data files had been uploaded properly onto the drives; and (c) confirm that the drive contained the information as identified by the time card.  If all was correct, Varner would put a check mark on the time card

---

[10] The computers on the truck could store video and data files for approximately two months worth of work; after that time the drives would become full and any new data would automatically overwrite the older data.  (Mahan Dep. at 40-41; Lockhart Dep. at 24.)

[11] The time cards tracked the number of hours worked by the individual members of the field crews to complete payroll.  (Mahan Dep. at 48-49; English Dep. at 24.)

and submit the card to English to generate payroll.  If anything was missing from the thumb drive, Varner was to contact the responsible employee and alert him to the problem.  The employee's payroll for that line segment would not be processed until the problem was corrected;

(2)  Perform a quality control review of the video and data files for each line segment, including uploading the files onto the server at Pratt City and organizing them in a manner where they were readily assessable and personally reviewing each video and data file for quality assurance purposes.  She was to confirm that the comments on the data file accurately described the images on the video, and detect and correct any errors in the descriptions;

(3) Prepare the transmittal letter of the finished work product to the City of Baton Rouge, which included (a) copies of the video and data files; (b) copies of any UTC reports; and (c) copies of any MEF forms; and

(4) Update the tracking sheets weekly to identify which line segments had been completed.

(Mahan Aff. ¶¶ 23-28; Mahan Dep. at 48-60, 80-81; Varner Dep. at 81-109.)

### D.  Problems in the Baton Rouge Project

In June 2009, Mahan first realized that there were some problems with the information that had been sent by VIS on the Baton Rouge project.  (Mahan Aff. ¶ 30; Mahan Dep. at 10-29.)  According to Mahan, in closing out work orders for the segments that had been completed, he realized that there were some inconsistencies between the punch lists submitted by the City engineers[12] and the records at VIS.

---

[12] The City of Baton Rouge hired an outside engineering firm to assist with processing the information submitted by VIS in preparation for its bidding the sewer project.  (Mahan Dep. at 118; Lockhart Dep. at 27-29.)  Typically there was a 3-month gap between VIS's submission and

(Id.)  More specifically, the punch lists indicated more incomplete line segments than the transmittal letters prepared and sent by Varner.  (Mahan Aff. ¶ 31.)  According to Mahan, he instructed Varner to resend the line segments identified in the punch lists as not being produced (but that VIS records indicated had been produced), but she told Mahan that she could not find the video and data files for the segments and that they must now have been provided to her by the work crews.  (Mahan Dep. at 10-29; Mahan Aff. ¶ 31; Lockhart Dep. at 102.)  Varner denies that this conversation ever took place.  (Varner Decl. at 20-22.)  Varner stated that Mahan never asked her to locate or reproduce a file.  (Id.)

Mahan contacted the work crew leaders to obtain the video and data files, but they told her that those files had been submitted, and that new data had already rewritten over the files.  (Mahan Aff. ¶32.) The work crew leaders told Mahan that the data must have been lost after its submission to Varner.  (Id.)  Regardless of how the files were lost, Mahan had no choice but to have the work crews return to the missing line segments and redo the work at the expense of VIS.  (Id. ¶¶ 33, 35.) Additionally,  because  of  these  and  other  inconsistencies,[13]  Mahan  assigned

---

the review by the engineers.  (Mahan Dep. at 71-72.)

[13] According to Mahan, "inconsistencies began to occur with greater frequency as the review of VIS' earlier data submittals . . . progressed."  (Mahan Aff. ¶ 36.)

14

Superintendent David Lockhart who was the manager of VIS's office in Decatur, Alabama, to provide on-site managerial supervision for the Baton Rouge contract. (Id. ¶ 36,)  Lockhart was also to serve as an intermediary between the City engineers and VIS.  (Id.; Lockhart Dep. at 16, 19-20.)

On August 12, 20, VIS met with the City engineers to review the progress on the Baton Rouge project.[14]  (Mahan Dep. at 10-29.)   During the meeting, the City engineers complained that the quality of the data files that VIS produced for line segments often contained inaccurate or incomplete descriptions of the line segments, thus rendering the data useless.  (Mahan Dep. at 73-74, 130.)  Additionally, they reported that the transmittal letters accompanying the data submittals were frequently inaccurate and did not include the video and data files for specified line segments. (Lockhart Dep. at 37; Renard Dep. at 29, 33-35.)  The engineers reported that because the "data submitted is a mess," they spent a large amount of time figuring out what segments were missing, and stated that 314 segments were currently missing from their records.  (Exh. C to Mahan Aff.; Mahan Dep. at 130; Lockhart Dep. at 113-15; Renard Dep. at 41-43.)  Because of these outstanding line segments, the City decided to not allow work to continue until all the missing segments were given to the

---

[14] VIS and the City engineers met on a weekly basis to review the progress of the project. (Mahan Dep. at 10-29.)  This meeting was the first time the engineers began to openly express dissatisfaction with the data submissions.  (Id.)

engineers which meant that VIS had to either locate the files or have them redone at the expense of VIS.  (Mahan Aff. ¶¶ 39-40.)  It also meant that VIS would have to incur the added expense of retaining work crews in Baton Rouge, despite having no new work orders to complete.  (Id. ¶ 40.)

Then, about a month later, Baton Rouge informed Blackmon that based on the numerous documented incidents of missing video and data files, there was a significant likelihood that Baton Rouge would terminated its contract with VIS. (Blackmon Dep. at 38; Mahan Dep. at 130-31.)  To avoid losing the contract, VIS needed to take immediate action to produce the missing files, improve the quality of the date files being submitted, and improve the accuracy in the reporting of completions of the line segments.  (Id.)

Then, on September 16, 2009, Lockhart received an e-mail from one of the City engineers stating that a video file for a specific line segment was missing from the March 2009 data submission.  (Lockhart Aff. ¶ 3; Renard Dep. at 37.)  The engineer requested that VIS locate and resend the missing video file.  (Id.)  According to Lockhart, he repeatedly contacted Varner concerning the particular line segment, but each time she told him that she was unable to locate and/or produce the data for that line segment.  (Lockhart Aff. ¶ 4.)  Varner, however, denies that Lockhart ever asked her to find the line segments, and contends that if she had been asked, she "could

have easily done so." (Varner Decl. at 27-29.) Regardless of whether these conversations occurred, it was added to the list of line segments to be redone by the work crews at the expense of VIS. (Lockhart Dep. at 37-38, 137-39; Lockhart Aff. ¶ 4.)

Because of all the alleged missing line segments, Lockhart began to personally follow work crews in the field as they began to redo many of the line segments. (Lockhart Dep. at 37-38, 137-39.) On October 1, 2009, Lockhart joined a work crew that was scheduled to redo the video and data file for the line segment identified in the September 16 e-mail. (Id.; Lockhart Aff. ¶ 7.) Lockhart contends that he called Varner one last time from the field to confirm that she could not locate the video and data files before work commenced, and Varner told Lockhart that the line segment was "lost." (Id.) Varner denies that Lockhart called her and asked her to find any missing line segments. (Varner Decl. at 30.)

Before the crew began the work, however, an inspector for Baton Rouge who had witnessed VIS complete the work for that line segment months earlier intervened and reviewed his records which showed that VIS completed the particular line segment on March 4, 2009. (Lockhart Dep. at 37-38, 137-39; Lockhart Aff. ¶ 8.) Lockhart testified that he immediately called Varner and told her to look for line segments entered on March 4, 2009. (Lockhart Aff. ¶ 9.) According to Lockhart,

Varner quickly found the allegedly "lost" line segment when using the entry date as a reference point.  (Id.)  Varner denies that this conversation ever took place or that she ever looked for or found any missing segments.  (Varner Decl. at 30-31.)

### E.  Varner's Suspension and Termination

On October 1, 2009, the same day as the above alleged incident, which Varner denies occurred, Lockhart prepared an Employee Warning Notice.  (Lockhart Aff. ¶10; Exh. C to Lockhart Aff.)  The warning was for "substandard work" and included the following remarks:

> On several occasions Debra has been unable to produce an accurate database for Baton Rouge projects.  She has not been entering data from videos, MEF and UTC forms. Inadequate data have resulted in street TV crews re-videoing line segments at great expense and embarrassment to our company. [The City Engineers] has requested data and she has repeatedly left out information . . . .

(Exh. C to Lockhart Aff.)   Lockhart recommended that Varner be terminated. (Lockhart Dep. at 9-17.)

Although Lockhart prepared the warning, it was never given to Varner and she had no knowledge of it until this litigation.  (Varner Decl. at 31.)  Instead, after receiving the warning notice from Lockhart, Blackmon and Mahan met with Varner to discuss the alleged problems on October 5, 2009.   (Blackmon Dep. at 28.) According to Varner, Blackmon told her that she was being suspended because of a

missing[15] file.  (Varner Dep. at 145-48; 257-60.)  Varner testified that she denied

being responsible for any missing file and told them that other people had access to

the files.  (Id. at 145-48.)  She stated that Blackmon responded by telling her that it

was her customer whose file was missing and that she was suspended for three days

without pay.[16]  (Id.)

     During Varner's suspension, Mahan conducted an audit of the data archives

and tracking spreadsheets that Varner was responsible for maintaining on the Baton

Rouge project.  (Mahan Dep. at 97-99, 104-05.)  Mahan testified that he found

numerous errors in her work, including: (1) failure to timely update tracking

spreadsheets to reflect which line segments had been completed by work crews; (2)

incorrectly naming manhole inspection videos, which caused an error in tracking the

work; and (3) poorly organized video and data files, resulting in Varner's inability to

resend the requested files.  (Id. 97-99, 104-05.)  As a result of this audit, Mahan

---

     [15] Although Varner's declaration states that Blackmon told her she was suspended for
deleting a file, (Varner Decl. ¶ 36) her deposition is clear that Blackmon actually said that the
suspension was for a missing file.  (Varner Dep. at 259-60.) It is well-established in the Eleventh
Circuit that a party cannot create a genuine issue of material fact by submitted an affidavit which
is in conflict with the party's earlier deposition testimony and which does not offer any valid
explanation for the conflict.  Van T. Junkins & Assocs. v. U.S. Indus., Inc., 736 F.2d 656, 658-59
(11th Cir. 1984) ("a district court may find an affidavit which contradicts testimony on
deposition a sham when the party merely contradicts its prior testimony without giving any valid
explanation.").

     [16] Blackmon and Mahan's version of the meeting was different.  They testified that they
reiterated the numerous complaints that had been raised about the quality of her work in the
Baton Rouge project.  (Mahan Dep. at 92-100; Blackmon Dep. at 28-30.)

recommended to Blackmon that Varner be terminated.  (Id. at 46-47; Blackmon Dep. at 30-31.)

When Varner returned to work on October 9, 2009, Blackmon, Mahan and English met with Varner in Blackmon's office.  (Varner Dep. at 148.)  During the meeting, Blackmon told Garner that she was being terminated because he had lost confidence in her ability to handle the Baton Rouge project (Blackmon Dep. at 30-31) and that "he was not comfortable with [her] work."  (Varner Dep. at 148-50)  Varner was offered a severance package, which she declined.  (Id. at 151.)

### F.  Allegations of Racial Harassment

Varner testified that she was subjected to the following separate incidents of racial harassment while she was employed at VIS:

(1) On Varner's first day of work in January 2008, she overheard an unknown employee stated "they hired another one to get rid of," but Varner's name was not mentioned.  (Varner Dep. at 155-57.)

(2) In November 2008, Blackmon held a meeting to inform the staff that money was missing from the office Coca-Cola machine.  Although no one accused her of stealing money, she presumed that she was the suspect because the locks to the entrances at the office were changed and Varner testified that shew as not given a key to access the building. (Id. at 164-75, 251.)  Varner never reported that she perceived this incident as discriminatory.  (Id. at 171.)

(3)  Sometime in 2008, Varner overheard a group of white employees say "where is the nigger girl today" and another employee responded "she doesn't work here on Fridays."  (Id. at 186-89.)  Varner did not

20

report this incident.  (Id. at 189.)

(4)   In May 2009, Varner showed Blackmon a photograph of her son and his prom date.  Varner alleges that Blackmon commented that Varner's son was dating a "pretty white girl," and when Varner replied that the girl was bi-racial, Blackmon said that he would not let his daughter date a person who was bi-racial.  (Id. at 157-60.)

(5) In or around May 2009, Varner overheard a conversation between Blackmon, Mahan, Donnie Keith and Steve Gauntney concerning the nomination of Justice Sotomayor to the Supreme Court.  Varner testified that Gauntney said "that damn President is trying to hire another wetback" to which Keith responded "that nigger it trying to hire all the niggers and wetbacks to put them in a position where they could mess up everything.  (Id. at 175-80.)   According to Varner, she approached Blackmon the next day and told him that she was offended by the conversation, and he responded with "Why do y'all get offended when we say nigger, but you can call each other that?"  (Id. at 180.)

(6) In August 2009, Varner overheard a telephone conversation between Blackmon and a former girlfriend where he said "I don't know why you hang around those kind of folks," where he was referring to an instance where the former girlfriend joined a black couple for a meal at a restaurant.  (Id. at 191.)

(7) In August 2009, Varner overheard English and a group of white employees talking about a magazine and one of them referred to "something about a nappy-headed girl" and another replied "don't say that too loud.  We have a nappy-headed girl working in the back."  (Id. at 152.)   Varner testified that she reported the alleged comments to Blackmon.  (Id. at 153-54.)

(8) In August 2009, Varner overheard Blackmon tell Kelvin Pruitt, an African American employee, to go to the unemployment office and "Get some wetbacks and put them in that hole and they will get it cleaned out for you.  They (referring to Latinos) don't mind getting dirty."  (Id. at 193-94, 210.)

Additionally, Varner testified that the racial harassment was so intense, that she suffered severe stress and had to take a medical leave of absence in January 2009. (Id. at 194-96.)   Varner did not tell her treating physician about the alleged harassment, however.  (Id.)

## IV. Applicable Substantive Law and Analysis

As explained above, each Defendant filed a separate Motion (Docs. #21 & 23) for Summary Judgment.  Carylon contends that it is not Plaintiff's "employer" under the antidiscrimination laws and cannot be held liable for the allegations contained in the complaint.  VIS contends that Plaintiff's claims fail as a matter of law because Plaintiff failed to rebut Defendants' legitimate, nondiscriminatory reasons for Plaintiff's termination (id. ¶ 2) and that she "failed to state a cognizable claim for racial harassment and/or hostile work environment."[17] (Id.)  The court addresses each Motion separately below.

### A.    As the Parent Company, Carylon is Not Liable as a Matter of Law.

Varner argues that a question of fact exists concerning whether Carylon, the parent corporation, and VIS, the wholly-owned subsidiary, form a single enterprise,

---

[17] The court notes that VIS's motion (Doc. # 23) for summary judgment does not address the retaliation claim asserted by Plaintiff.  (See also doc. #41.)  As such, that claim will remain a part of the case after the court decides the pending motions for summary judgment and must be tried to a jury.

making them both potentially liable for the actions complained of in the Complaint. In general, there is a strong presumption that a parent corporation is not hte legal employer of its subsidiary's employees and thus, a parent company is ordinarily not liable for the discriminatory acts of its subsidiary. See Lusk v. Foxmeyer Health Corp., 129 F.3d 773, 778 (5th Cir. 1997). However, a plaintiff may overcome that presumption by proving that the parent company and its subsidiary are a single enterprise. See Lyes v. City of Riviera Beach, 166 F.3d 1332, 1341 (11th Cir. 1999).

The test for determining a single enterprise originated under the Fair Labor Standards Act, see Radio & Television Broad. Technicians Local Union 1264 v. Broad. Serv. of Mobile, Inc., 380 U.S. 255, 256 (1965), but the Eleventh Circuit and other Circuits also apply this test in Title VII and other employment discrimination cases. See Lyes v. City of Riviera Beach, 166 F.3d 1332, 1341 (11th Cir. 1999) (Title VII); Llampallas v. Mini-Circuits Lab., Inc., 163 F.3d 1236, 1244 (11th Cir. 1998); Swallows v. Barnes & Noble Book Strores, Inc., 128 F.3d 990, 992 n.2 (6th Cir. 1997). Although the case law is silent as to whether such test applies to cases brought under section 1981,[18] the parties present their argument under this framework (doc. #22 at 6-11; doc. # 31 at 3-5), and the court assumes that the same framework

---

[18] The Fifth Circuit has assumed, without deciding, that the same framework applies to cases brought under section 1981. Johnson v. Crwon Enters., Inc., 398 F.3d 339, 343 (5th Cir. 2005).

applies to Title VII and section 1981 claims.[19]

Therefore, for Varner to establish liability on the part of Carylon, the parent corporation, she must establish that Carylon was her "employer" as that term is understood in Title VII. See 42 U.S.C. § 2000e(b). Title VII defines "employer" as "a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year, and any agent of such a person." Id. To determine whether two separate entities are an individual's single employer, the court considers the: "(1) interrelation of operations; (2) centralized control of labor relations; (3) common  management; and (4) common ownership or financial

---

[19] Application of this framework makes analytical sense. To bring a claim under Section 1981, a plaintiff must have a contractual relationship with the defendant.  Section 1981 claims used to be limited to the formation of contracts, Patterson v. McLean Credit Union, 491 U.S. 164, 179 (1989), but Congress amended the statute in 1991, in part to overrule the Patterson decision, and Section 1981 now applies to discrimination in the "making, performance, modification, and termination of contract, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b).  Since this amendment, Section 1981 now brings relief in the context of employment discrimination –  the performance of an employment contract – much in the same way as Title VII.  Indeed, courts now analyze the causes of action in the same way, finding that they present similar elements. See Smith, et al., v. Lockheed–Martin Corp., 644 F.3d 1321, 1325 n.14 (11th Cir. 2011); Wright v. Southland Corp., 187 F.3d 1287, 1298 n.12 (11th Cir. 1999); Peterson v. BMI Refractories, 132 F.3d 1405, 1412 n.13 (11th Cir. 1998).   To determine who is liable for an employment contract under Section 1981, it is therefore appropriate to analyze an "employer" –  that is, the person who made the contract and acts pursuant to it – in much the same way as Title VII dictates. See  Standard v. A.B.E.L. Servs., Inc., 161 F.3d 1318, 1330 (11th Cir. 1998) (noting that these statutes have the same requirements of proof and use the same analytical framework); Cooper v. Southern Co., 260F. Supp2d. 1278, 1283 n.1 (N.D. Ga. 2003); Richard v. Bell Atlantic Corp., 946 F.Supp. 54, 61 n.2 (D.D.C. 1996); Sargent v. McGrath, 685 F.Supp. 1087, 1089 (E.D.Wis. 1988.).

control." Lyes, 166 F.3d at 1341; see also McKenzie v. Davenport–Harris Funeral Home, 834 F.2d 930, 933 (11th Cir. 1987).   The court is aware that not every factor need be present, and no single factor is controlling under the "single employer test.". Lyes, 166 F.3d at 1341 n.5; see also Armbruster v. Quinn, 711 F.2d 1332, 1337–38 (6th Cir. 1983); Rivera v. Puerto Rican Home Attendants Servs., Inc., 922 F.Supp. 943, 949 (S.D.N.Y. 1996).   The focal point of the court's inquiry is "the degree of control an entity has over the adverse employment decision on which the Title VII suit is based." Llampallas, 163 F.3d at 1244; see also Schweitzer v. Advanced Telemarketing Corp., 104 F.3d 761, 764 (5th Cir.1997) ("single employer" analysis may be refined to single question, "What entity made the final decisions regarding employment matters related to the person claiming discrimination?").

### 1.  Interrelation of Operations

Courts have looked to seven indicia of interrelatedness that the court should weight in considering the first factor, interrelation of operations: (1) combined accounting records; (2) combined bank accounts; (3) combined lines of credit; (4) combined payroll preparation; (5) combined switchboards; (6) combined telephone numbers; and (7) combined offices.  See Walker v. Boys & Girls Club of America, 38 F.Supp. 2d 1326, 1333 (M.D. Ala. 1999); Fike v. Gold Kist, Inc., 514 F.Supp. 722, 726 (N.D. Ala. 1981) (citing Western Union Corp. v. United Telegraph Workers, 224

NLRB 274, 277, 1976 WL 7018 (1976), aff'd, 571 F.2d 665 (D.C.Cir. 1978)).  None of these elements exist between Carylon and VIS.  VIS keeps its own accounting records, bank accounts, payroll preparation, switchboard control and telephone numbers and office headquarters.  (Harris Aff; Blackmon Aff.)

Plaintiff asserts, however, that the operations are interrelated and points to the following: (1) Carylon makes decisions "with regard to VIS" (doc. #31 at 2); (2) Harris has the ability to review the financial records of VIS (doc. #31 at 2); and (3) Varner testified that she "received checks" from Carylon (doc. #31 at 4).  None of these are convincing, however.  First, that Carylon makes decisions regarding VIS is not surprising since VIS is a wholly-owned subsidiary.  Parent companies routinely make decisions about a subsidiary, inherent with ownership, but those decisions in this case are not indicative of control.  There is simply no evidence that Carylon makes and controls operational decisions for VIS, like dictating who to hire and fire, which lines of business to pursue and the like.  Likewise, that Harris reviews the financial date of VIS on a quarterly basis is not evidence of dominant control but rather evidence of prudent corporate management.

Finally, Varner's testimony that she "received checks" from Carylon is not supported by the record.  Instead, the record reveals that the April 30, 2009 Employee Loan Request was authorized by Blackmon (as opposed to Harris) and that the

advance was repaid to VIS by Varner.  (Blackmon Aff.)

### 2. Control of Labor Relations

The second factor of the NLRB standard - whether there is centralized control of labor relations - "is usually accorded greater weight than the others."  Thornton v. Mercantile Stores Co., 13 F.Supp.2d 1282, 1291 (M.D.Ala. 1998). The "control" required to meet the test of centralized control of labor relations is "actual and active control of day-to-day labor practices."  Fike, 514 F.Supp. at 727.

The evidence in the record does not support the notion that Carylon exercises control over labor relations at VIS.  There is simply no evidence that Carylon had any typical of active control or influence over the day-to-day operations and personnel functions of VIS.  For example, Carylon has never (1) hired or fired any employees of VIS; (2) imposed any sort of discipline over VIS employees; (3) directed work assignments; (4) supervised work; (5) set rates of pay for work crews or Video Data Technicians; or (6) set work schedules.  (See Blackmon Aff; Harris Aff.)

Plaintiff, however, asserts that Carylon does exercise control over labor relations and points to the following: (1) Blackmon periodically consults with members of Carylon concerning human resources and occupational safety issues (doc. #31 at 2); and (2) Varner testified that she submitted vehicle reports to Carylon (doc. #31 at 3-4).  Neither of these arguments are persuasive.  First, periodic consultation

is extremely different than exercising any type of control over human resources and safety issues.  Consultation is to be expected on such issues between parent companies and wholly-owned subsidiaries, but it certainly does not translate into evidence of decision-making and control of those areas.  Second, a single discreet interaction between Varner and Carylon does not constitute domination over the operations of VIS.  Notably, Varner was never evaluated or critiqued for completing this discreet task of sending vehicle maintenance records to Carylon.  In short, this small interaction does not have any indicia of the typical employer-employee relationship.

### 3.  Common Management

The "common management" factor generally turns on whether there are common directors and officers for both the parent corporation and the subsidiaries. See McKenzie, 834 F.2d at 933 (pointing out existence of common managers in both companies); Thornton v. Mercantile Stores Co., 13 F.Supp.2d 1282, 1294 (M.D. Ala. 1998) (common management factor satisfied when senior officials of parent company also held senior management positions within subsidiary).  Here, there is simply no evidence of common management.  Plaintiff has not come forward with any individuals who held management positions at both Carylon and VIS.  It is undisputed that Blackmon manages VIS. (Blackmon Dep. at 11, 18, 35, 40.)  It is

28

also undisputed that Blackmon does not serve as an officer or director of Carylon. (Blackmon Aff.)  Given the lack of any overlap or interrelation of officers, directors or other key managers among the two companies, a reasonable factfinder could not find that he management structure of Carylon and VIS is sufficiently intertwined, enmeshed or entangles to satisfy the "common management" requirement.

### 4.   Common Ownership

It is undisputed that VIS is a wholly owned subsidiary of Carylon.  Nothing further is required to establish the "common ownership" prong of the single employer test.  Frank v. U.S. West, Inc., 3 F.3d 1357, 1364 (10th Cir. 1993) (deeming common ownership factor satisfied simply because parent is sole shareholder of subsidiary); Thornton, 13 F.Supp.2d at 1294 (similar).

### 5. Conclusion

Taking into consideration all of the above, Plaintiff cannot establish that Carylon was her employer for purposes of Title VII and section 1981.  Therefore, Carylon cannot be held liable for any of the allegations asserted in this lawsuit, and summary judgment is proper as to Defendant Carylon Corporation.[20]

---

[20] In the alternative, even if Carylon was deemed a "single employer" with VIS, Plaintiff's claims would fail for the same reasons her claims fail against VIS.  See infra, IV.B.

**B.     Plaintiff's Disparate Treatment Claim Against VIS Fails as a Matter of Law.**

Plaintiff brings her claims of race discrimination under both Title VII and Section 1981. (Compl. ¶¶ 89-97.) Claims of race discrimination under section 1981 are analyzed in the same manner as disparate treatment claims brought under Title VII.

A plaintiff may attempt to establish a claim of illegal employment discrimination through the use of direct evidence, circumstantial (indirect) evidence, or statistics.[21] See id.; see also Schoenfeld v. Babbitt, 168 F.3d 1257, 1266 (11th Cir. 1999) (recognizing the availability of either direct or circumstantial evidence). Here, Plaintiff has presented only circumstantial evidence of racial discrimination and retaliation. "In evaluating [discrimination] claims supported by circumstantial evidence, [the courts of this circuit] use the now-familiar framework established by the United States Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), and Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981)." Combs, 106 F.3d at 1527. Under the McDonnell Douglas and Burdine framework, the

---

[21]   See also McDonnell Douglas, 411 U.S. at 802 n.13 ("The facts necessary will vary in Title VII cases, and the specification above of the prima facie proof required from respondent is not applicable in every respect in different factual situations.").

30

plaintiff first has the burden of establishing a prima facie case of discrimination, which creates a rebuttable presumption that the employer acted illegally. See id. at 1527-28. The methods of presenting a prima facie case, as well as the exact elements of the case, are not fixed; rather they are flexible and depend to a large degree upon the facts of the particular situation. See, e.g., Nix v. WLCY Radio/Rahall Communications, 738 F.2d 1181, 1185 (11th Cir. 1984); Lincoln v. Board of Regents of Univ. Sys., 697 F.2d 928, 937 (11th Cir. 1983). In general, a plaintiff establishes a prima facie case of disparate treatment employment discrimination by showing that he or she was a qualified member of a protected class and was subjected to an adverse employment action but that otherwise similarly situated employees outside the plaintiff's class were treated dissimilarly. See McDonnell Douglas, 411 U.S. at 802 (hiring); Holifield v. Reno, 115 F.3d 1555, 1562 (11th Cir. 1997) (discipline); see also Nix, 738 F.2d at 1185 (discipline); Pittman v. Hattiesburg Mun. Separate Sch. Dist., 644 F.2d 1071, 1074 (5th Cir. 1981) (wages).

Once the plaintiff has shown a prima facie case and, thereby, has raised the presumption of discrimination, the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions.[22] See Rojas, 285 F.3d

---

[22] See Chapman, 229 F.3d at 1032 (A subjective reason is a legally sufficient, legitimate, nondiscriminatory reason if the defendant articulates a clear and reasonably specific factual basis upon which the employer based its subjective opinion.).

31

at 1342; Combs, 106 F.3d at 1528.  The employer "need not persuade the court that it was actually motivated by the proffered reasons." Burdine, 450 U.S. at 254-55; see Chapman, 229 F.3d at 1024.  If the employer satisfies that burden by articulating one or more such reasons, then the presumption of discrimination falls and the burden of production again shifts to the plaintiff to offer evidence sufficient for a reasonable jury to conclude that the employer's supposedly legitimate reason is merely a pretext for illegal discrimination.[23]  Where the defendant articulates multiple, reasonable, legitimate and nondiscriminatory reasons, plaintiff must rebut each of defendant's proffered reasons.  See Chapman, 229 F.3d at 1024-25.

Despite this shifting of the burden of production between the plaintiff and the defendant under the McDonnell Douglas and Burdine framework, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." Burdine, 450 U.S. at. 253. Given that the ultimate burden of persuasion always lies with the employee, a plaintiff may prevail on an employment discrimination claim and may also defeat a summary judgement either by proving that intentional discrimination did indeed motivate the defendant or by producing sufficient evidence to allow a rational trier

---

[23] If the proffered reason is one that might motivate a reasonable employer, a plaintiff cannot recast the reason but must meet it head on and rebut it.  Simply quarreling with that reason is not sufficient.  Chapman, 229 F.3d at 1030.

of fact to disbelieve the employer's proffered legitimate reasons, thus permitting but not compelling the trier of fact to make a finding of illegal discrimination.  See Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 147-48 (2000) (pointing out that the production of the necessary sufficient evidence by plaintiff will not always prevent the employer from prevailing on a Rule 50 motion and suggesting that the strength of plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other properly considered evidence that supports the employer's case are among other factors to take into account in evaluating a Rule 50 motion); St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502 (1993); Abel v. Dubberly, 210 F.3d 1334, 1339 (11th Cir. 2000); Alexander v. Fulton County, 207 F.3d 1303, 1336 (11th Cir. 2000); Combs, 106 F.3d at 1529-38 (interpreting Hicks and the post-Hicks case law); Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 920-21 (11th Cir. 1993).

### 1.  Prima Facie Case of Discrimination in Termination

To establish a prima facie case of disparate treatment in termination, Plaintiff must show that: (1) she is a member of a protected class; (2) she was subjected to an adverse employment decision; (3) she was qualified to do her job; and (4) she was replaced by someone outside her protected class.  Cuddeback v. Fla. Bd. of Education, 381 F.3d 1230, 1235 (11th Cir. 2004).  Defendant VIS concedes that

Varner is a member of a protected class and that she was subjected to an adverse employment decision.  Defendant disputes the third and fourth elements of the prima facie case, which the court discusses separately below.

### a.  Qualified to do the Job

VIS's argument regarding Varner's qualifications for the job is misplaced. VIS contends that Varner cannot establish the qualification prong of the prima facie case because she did not meet VIS's legitimate employment expectations in the position. (Doc. # 24 at 26-28; Doc. #43 at 3-5.)  In support of this argument, VIS discusses all the alleged problems which it contends eventually led to Varner's termination.  (Id.) VIS's discussion, however, misstates the applicable standard used in the Eleventh Circuit.  Past rulings in the Eleventh Circuit, as well as other Circuits, hold that satisfaction of an employer's expectations is not a requisite element of a prima facie employment discrimination case.  See Walker v. Mortham, 158 F.3d 1177, 1192-93 (11th Cir. 1998); Vessels v. Atlanta Indep. School Sys., 408 F.3d 763, 769 (11th Cir. 2005); accord Fowle v. C & C Cola, 868 F.2d 59, 65 (3d Cir. 1989); Medina v. Ramsey Steel Co., 238 F.3d 674, 681 (5th Cir. 2001); Wexler v. White's Fine Furniture, 317 F.3d 564, 575 (6th Cir. 2003) (en banc); Jayasinghe v. Bethlehem Steel Corp., 760 F.2d 132, 135 (7th Cir. 1985); Legrand v. Trustees of Univ. of Ark., 821 F.2d 478, 481 (8th Cir. 1987); Lynn v. Regents of Univ. of Cal., 656 F.2d 1337,

1344–45 (9th Cir. 1981); Burrus v. United Tel. Co., 683 F.2d 339, 342 (10th Cir. 1982).  Instead, only objective job qualifications are considered in evaluating the plaintiff's prima facie case, and the question of whether an employee meets the employer's expectations is left to the later stage of the McDonnell Douglas analysis. Vessells, 408 F.3d at 769. "Because the issue of [Varner's] job performance is intertwined with the issue of whether [her] termination was pretextual," the court will not examine her job performance until the pretext analysis.  Holifield v. Reno, 115 F.3d 1555, 1562 n.3 (11th Cir. 1997) (citing Anderson v. Baxter Healthcare Corp., 13 F.3d 1120, 1124 n.4 (7th Cir. 1994); Weldon v. Kraft, Inc., 896 F.2d 793, 798 (3rd Cir. 1990)).

### b.  Replaced by an Individual Outside her Protected Class

As to the fourth element, Defendant confuses the elements of the prima facie case, although the court admits that the Eleventh Circuit often does the same thing. In a termination case like the one here, the plaintiff does not have to establish the existence of similarly situated comparators:  "A prima facie case of discrimination in termination is established where the plaintiff proves by a preponderance of the evidence that he or she is a member of a protected class, was qualified for the position held, and was discharged and replaced by a person outside of the protected class or was discharged while a person outside of the class with equal or lesser qualifications

was retained." Walker v. Mortham, 158 F.3d 1177, 1187 n.21 (11th Cir. 1998) (emphasis in original) (citing Lee v. Russell County Bd. of Educ., 684 F.2d 769, 773 (11th Cir.1982)).  The disjunctive nature of the prima facie standard has been overlooked by many courts for whatever reason and has caused much confusion in the precedent. See Walker, 158 F.3d at 1187 n.21.  However, the earliest cases which articulate the prima facie elements in termination cases do not support an element of relative qualifications if the employer has filled the plaintiff's position with a person outside the plaintiff's protected class. See Lee, 684 F.2d at 773; Jackson v. City of Killeen, 654 F.2d 1181, 1183-84 & n.3 (5th Cir. 1981); Rhode v. K.O. Steel Castings, Inc., 649 F.2d 317, 322 (5th Cir. 1981).  Because the court is bound to follow the "earliest case rule," see Walker, 158 F.3d at 1188-89, the court does not require the plaintiff to establish the similarly situated element in this termination case.

Instead, Varner must simply establish that she was replaced by someone outside her protected class. See Cuddeback, 381 F.3d at 1235.  This she has clearly done.  The record shows that after Varner's termination, Hood and Mahan, both white, took over her job responsibilities. (Lockhart Dep. at 124-25; Hood Dep. at 67; Mahan Dep. at 47-48, 88.)  This evidence establishes the fourth element of her prima facie case, thereby, raising the presumption of discrimination.  Under the McDonnell Douglas and Burden framework, the burden of production now shifts to VIS to

36

articulate a legitimate, nondiscriminatory reason for its actions.  See Rojas, 285 F.3d

at 1342; Combs, 106 F.3d at 1528.

### 2.   Legitimate, Nondiscriminatory Reason for Termination and Pretext

Although Varner successfully established a prima facie case of disparate

treatment race discrimination, her claim nevertheless fails because Defendant has

successfully rebutted any inference of discrimination, and Varner cannot show that

the articulated reason for her termination was a pretext for discrimination.  See

Holifield, 115 F.3d at 1564-65.  Defendant states that Varner was terminated because

of her poor job performance on the Baton Rouge contract.  (Doc. #24 at 29.)  Courts

have consistently held that poor job performance is a legitimate, nondiscriminatory

reason to terminate an employee. Therefore, Defendant has met its burden of

articulation, the presumption of discrimination is destroyed, (assuming one had been

created in the first place), and the burden shifts back to Varner to show by a

preponderance of the evidence that race discrimination motivated the decision to

terminate her.  See Sierminski v. Transouth Fin. Corp., 216 F.3d 945, 950 (11th Cir.

2000).

Pretext is established when a plaintiff "present[s] concrete evidence in the form

of specific facts" showing that the defendant's proffered reason was pretextual.

Bryant v. Jones, 575 F.3d 1281, 1308 (11th Cir. 2009).  "[The plaintiff] may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence."   Jackson v. State of Ala. State Tenure Comm'n, 405 F.3d 1276, 1289 (11th Cir.2005) (quotation marks omitted); see also Vessels v. Atlanta Indep. Sch. Sys., 408 F.3d 763, 771 (11th Cir.2005) (A plaintiff's evidence of pretext "must reveal such weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could find them unworthy of credence.").  A plaintiff does not demonstrate pretext by showing that the defendant had a mistaken belief about the facts that formed the basis for the alleged nondiscriminatory reason. Woodard v. Fanboy, L.L.C., 298 F.3d 1261, 1265 (11th Cir. 2002).  Instead, the plaintiff must present evidence that the defendant did not honestly believe the facts on which it based its nondiscriminatory reason.  Id.  Further, when the employer provides a reason "that might motivate a reasonable employer, an employee must meet that reason head on and rebut it . . . ." Chapman, 229 F.3d at 1030.  Conclusory allegations and assertions of discrimination are insufficient. See Bryant, 575 F.3d at 1308.

Varner's pretext arguments are centered on both theories of pretext - that the

38

stated reasons are unworthy of belief and that race more than likely motivated the decision to terminate her.  The court addresses each argument in turn.

### a.  Whether the Stated Reason for Her Termination is Worthy of Belief

The main thrust of Varner's argument is that Blackmon, Mahan and Lockhart are lying, that she was a "hard-working and diligent employee" who did not make any of the mistakes alleged, and that she was the "fall guy" for the problems that came up with the Baton Rouge client.  (Doc. # 28 at 16-23.)  Throughout her brief, Varner vehemently denies any allegation of poor work performance or that she ever could not locate a file, that she misplaced a file, or that she lost a file.  She points to other possible explanations for the mishandling of the files, but all are pure speculation without one shred of evidence to support them.

Most of her argument is made of self-serving assertions which do not aid in her burden of establishing that VIS believed that her job performance was not poor as it related to the Baton Rouge project.  To show that the proffered reason for her termination was pretextual, Varner must show that VIS based the decision to discipline her on an unreasonable belief that she behaved in the manner alleged.  See, e.g., Silvera v. Orange County Sch. Bd., 244 F.3d 1253, 1261 (11th Cir. 2001), cert. denied, 534 U.S. 976 (2001) (pretext means more than a mistake by the employer;

actions taken based on a mistaken, non-discriminatory belief do not violate Title VII);
Lee v. GTE Fla., Inc., 226 F.3d 1249, 1253 (11th Cir. 2000), cert. denied, 532 U.S.
958 (2001); Equal Employment Opportunity Comm'n v. Total Sys. Servs., Inc., 221
F.3d 1171 (11th Cir. 2000) (plaintiff could be properly discharged on defendant's
good faith belief that she lied in an internal investigation); Alexander v. Fulton
County, Ga., 207 F.3d 1303, 1339 (11th Cir. 2000), reh'g denied, 218 F.3d 749 (11th
Cir. 2000) ("a plaintiff must show not merely that the defendant's employment
decisions were mistaken but that they were in fact motivated by race."); Elrod v.
Sears, Roebuck & Co., 939 F.2d 1466, 1470 (11th Cir.1991) (court's pretext inquiry
is properly limited to whether the decision-makers believed the employee had
engaged in conduct for which he was terminated and if so whether this belief was the
reason for the discharge, not whether plaintiff was actually guilty of the conduct);
Conner v. Fort Gordon Bus Co., 761 F.2d 1495, 1501 (11th Cir.1985) (employer's
belief, honest but mistaken, may nonetheless provide legitimate reason for discharge).
Despite Varner's conclusory assertion to the contrary, she has offered no evidence
which contradicts the evidence before this court that Defendant terminated her
because it believed that her poor job performance had cost them time, money and
their reputation with the Baton Rouge project. See Thomas v. Miami Veterans Med.
Cntr., 290 Fed. Appx. 317, 320 (11th Cir. Aug. 26, 2008) (conclusory allegations

insufficient to support pretext); Mayfield v. Patterson Pump Co., 101 F.3d 1371, 1376 (11th Cir. 1996) (conclusory allegations, without more, are insufficient to show pretext).

In the absence of such evidence, Varner's pretext argument fails. The record shows that Defendants believed in good faith that Varner's job performance was poor, that her poor performance had lost VIS time, money and their reputation with the Baton Rouge project, and accordingly terminated Varner. See Holifield, 115 F.3d at 1565 ("The inquiry into pretext centers upon the employer's beliefs, and not the employee's own perceptions of his performance."). Whether Varner actually misplaced, mislabeled or lost the files is not an issue for this court to referee. See Wilson v. B/E Aerospace, 376 F.3d 1079, 1092 (11th Cir. 2004). Holmes v. West Palm Beach Hous. Auth., 309 F.3d 752, 755 (11th Cir.2002) ("An employer articulates a legitimate nondiscriminatory reason for termination where the employer had an honest, good faith belief in the reason for termination, even if it turns out that the employer was mistaken in that belief."); E.E.O.C. v. Total Sys. Servs., Inc., 221 F.3d 1171, 1176 (11th Cir. 2000) ("'Pretext is not demonstrated by showing simply that the employer was mistaken.'") (quoting Sempier v. Johnson & Higgins, 45 F.3d 724, 731 (3d Cir.1995)). Abel v. Dubberly, 210 F.3d 1334, 1338-1339 (11th Cir. 2000) ("An employer successfully rebuts any prima facie case of disparate treatment

by showing that it honestly believed the employee committed the violation"); see also Turner v. Texas Instruments, Inc., 555 F.2d 1251, 1256 (5th Cir. 1977) (Even if an employer wrongly believes that a plaintiff violated its policy, if the employer acted on its good faith belief it is not guilty of discrimination).  A discrimination plaintiff cannot establish pretext by simply asserting that his employer was mistaken.  Elrod v. Sears, Roebuck & Co., 939 F.2d 1466, 1470 (11th Cir. 1991) (noting that courts do not second guess an employer's business judgment and that plaintiff cannot establish pretext merely by demonstrating that a reported work rule violation did not occur).  At best, that is all Varner has done here, and it is insufficient to establish pretext.  As such, the court turns to Varner's remaining pretext argument.

### b.  Evidence that Race More than Likely Motivated the Termination Decision

Varner essentially makes two arguments to establish that race more likely motivated the termination decision.  First, she argues that the engineers from the Baton Rouge project were putting pressure on VIS to straighten out the problems with the submissions or VIS would lose the contract.  (Doc. #28 at 23-24.)  Varner contends that other white employees had made mistakes, but VIS decided to terminate the only African American employee in the office when faced with this pressure from the Baton Rouge project.  (Id. at 24-25.)

42

This argument does nothing to establish racial animus or a discriminatory motive on the part of the decisionmakers.  What is glaringly missing from this argument is the fact that the decisionmakers believed, whether or not their belief was correct, that Varner was responsible for the increasing pressures to "get it right" from the engineers on the Baton Rouge project.  The fact that Varner is African American has absolutely nothing to do with the perceived mistakes that were hampering the project and costing VIS time and money.  Additionally, even if this belief was completely false and Varner never made one error in her twenty-one months on the job as Varner contends, being the "fall guy" so that VIS would not lose the contract with Baton Rouge does nothing to establish discrimination on the basis of her race.  Although Varner repeatedly emphasizes that she was the only African American employee in the office, she was also the only employee in the office responsible for inputting the data on the Baton Rouge project.

Second, Varner contends that she has evidence of racial animus on the part of the ultimate decisionmaker, Blackmon.  She cites to comments made by other co-workers in Blackmon's presence as well as to comments by Blackmon.  Specifically, Varner cites to the following: (1) Blackmon's May 2009 comment to Varner that he would not let his daughter date a bi-racial person; (2) Blackmon's presence in a conversation in May 2009 where the words "nigger and wetback" were used to refer

to President Obama and Justice Sotomayor, respectively, and his comment of "why do y'all get offended when we say nigger, but you can call each other that?" when Varner complained about the conversation; (3) an overheard phone conversation in August 2009, where Blackmon told his girlfriend "I don't know why you hang round those kind of folks," allegedly referring to an African American couple; and (4) an overheard conversation in August 2009, where Blackmon told an African American employee to go to the unemployment office and "get some wetbacks" to do a certain job because "they don't mind getting dirty."

Although the Eleventh Circuit has held that a supervisor's race-based derogatory comments can be used to support an inference that an employment decision was motivated by racial bias, see Ross v. Rhodes Furniture, Inc., 146 F.3d 1286, 1291 (11th Cir. 1998), these four isolated comments, over a period of almost two years, is simply insufficient to establish pretext.  They may be offensive and completely inappropriate, but they do not establish that Blackmon was motivated by racial animus in his decision to terminate Varner.  The alleged comments have absolutely nothing to do with the employment decision at issue, nor where they made within a close temporal proximity to her termination.  Simply put, these isolated, unrelated comments do not tilt the balance and establish pretext in the decision to terminated Varner.

In summary, Varner has not created a genuine issue of material fact as to whether Defendant's articulated reason for her termination was pretextual.  See Chapman, 229 F.3d at 1024-25.  Defendant VIS's motion for summary judgment is due to be granted as to the termination claim.

### C.  Plaintiff's Racial Harassment Claim Fails as a Matter of Law.

A hostile-work-environment claim is established through proof that "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Harris v. Forklift Sys., Inc., 510 U.S. 17, 21(1993) (quotations and citation omitted).  To establish a hostile environment claim, a plaintiff may establish that: (1) she belongs to a protected group; (2) she has been subjected to unwelcome harassment; (3) the harassment was based on her protected characteristic; (4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive work environment; and (5) the employer is responsible for the environment, either directly or vicariously.  Miller v. Kenworth of Dothan, Inc., 277 F.3d 1269, 1275 (11th Cir. 2002); Mendoza v. Borden, Inc., 195 F.3d 12 38, 1245 (11th Cir. 1999) (en banc) (citation omitted). "Workplace conduct is not measured in isolation." Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 270 (2001) (per curiam).  Rather, the evidence

45

of harassment is considered both cumulatively and in the totality of the circumstances. Mendoza, 195 F.3d at 1242.

The fourth element, whether the conduct was "sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment," is the element that often tests the legitimacy of most harassment claims; and that test is true here. Gupta v. Fla. Bd. Of Regents, 212 F.3d 571, 583 (11th Cir. 2000). Either severity or pervasiveness suffices to establish the fourth element. Reeves v. C.H. Robinson Worldwide, Inc., 594 F.3d 798, 808 (11th Cir. 2010) (en banc). "In evaluating allegedly discriminatory conduct, [the court] consider[s] its frequency . . . ; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Id. at 808-09 (quotation omitted).

Additionally, the fourth element of the hostile-work-environment test contains both a subjective and objective component. The employee must "subjectively perceive" the harassment as severe or pervasive enough to change the terms or conditions of employment, and the district court must find that this perception was objectively reasonable. Id. The objective severity or pervasiveness of harassment "should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances." Id. at 809 (quotations omitted). "As the

46

Supreme Court has observed, '[t]he real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed.' " Id. at 810 (quoting Oncale v. Sundowner Offshore Services, Inc., 523 U.S. 75, 81-82 (1998)).

Applying these legal standards to the facts of this case, it is clear that a reasonable person could not conclude, based on the totality of the evidence presented by Varner, that the alleged harassment was sufficiently severe or pervasive to constitute a hostile work environment based on race.   Although race-specific language that imposes a change in the terms or conditions of employment based on race will violate Title VII and Section 1981, general vulgarity, epithets and offensive references to race that are indiscriminate in nature, will not, standing along, generally be actionable.   The Supreme Court has never held that workplace harassment is automatically discrimination because of race merely because the words used are racial and/or offensive in nature.   This is all Varner has presented.   Instead, the test is whether "members of one [race] are exposed to disadvantageous terms or conditions of employment to which members of the other [race] are not exposed." Oncale, 523 U.S. at 80 (quoting Harris, 510 U.S. at 28 (Ginsburg, J., concurring)).   This sort of evidence is not present in this case.

47

Moreover, the evidence presented by Varner does not paint a picture of a workplace permeated by racial slurs and offensive remarks because of race.  Instead, Varner testified regarding eight (8) separate incidents over a period of twenty-one months.[24]  The comments and racial slurs, although subjectively offensive, did not occur on a regular basis and, instead, were sporadic in nature and did not reflect the overall work environment at VIS.  See McCann v. Tillman, 526 F.3d 1370, 1378 (11th Cir. 2008) ("Although offensive, such instances of racially derogatory language alone, extending over a period of more than two years, are too sporadic and isolated to establish that her employers' conduct was so objectively severe or pervasive as to alter the terms and conditions of her employment."); Barrow v. Georgia Pacific Corp., 144 Fed. Appx. 54 (11th Cir. August 12, 2005); Standifer v. Sonic-Williams Motors, LLC, 401 F. Supp.2d 1205, 1219-20 (N.D. Ala. 2005).   Varner does not allege that anyone ever used racially derogatory speech towards her.  Moreover, although Varner alleges that she was upset by this language and reported a few instances to Blackmon, she has not demonstrated that the alleged environment interfered with her job performance.   At the most, these comments were offensive utterances, which were not particularly severe, and were definitely not physically threatening or humiliating.

---

[24] And the court notes that not all of those comments even referred to Plaintiff's race, African American, but some of them dealt with Hispanics.

Allowing Varner's hostile environment claim to continue would be dishonest to the longstanding proposition that Title VII is not a federal "civility code." <u>Oncale</u>, 523 U.S. at 80. Construing the facts in the light most favorable to Varner in the totality of the circumstances, the actions complained of by Varner were not sufficiently severe or pervasive to alter her terms or conditions of employment. VIS, therefore, is entitled to summary judgment as to this claim.

## V.  Conclusion

In conclusion, Carylon's Motion (Doc. #21) for Summary Judgment is due to be granted in full.  The Motion (Doc. #23) for Summary Judgment filed by VIS is also due to be granted in full.  The only remaining claim in this case is Varner's retaliation claim against VIS.[25]  A separate order will be entered.

**DONE** this the___2nd___day of April, 2012.

_James H. Hancock_

SENIOR UNITED STATES DISTRICT JUDGE

---

[25] <u>See</u> footnote 1.

49